IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 2:25-cr-44 |
| CORY RICHARD HAMBLEY, | |
| Defendant. | |

**DEFENDANT'S POSITION ON SENTENCING**

Defendant Cory Richard Hambley, by and through his attorneys, Robert C. Gottlieb, Gottlieb Townsend, and Mario Lorello, Zoby & Broccoletti P.C., in accordance with 18 U.S.C. § 3553(a), files this Position with Respect to Sentencing in the instant case.  Mr. Hambley pleaded guilty pursuant to a plea agreement (Doc. 53), to one count of conspiracy to produce visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2251(a) and (e), and one count of use of an interstate commerce facility to entice a minor to engage in sexual activity, in violation of 18 U.S.C. §§ 2422(b) and 2.  The Presentence Investigation Report ("PSR") has been reviewed and there are no objections to the ***advisory*** guideline's offense level of 43, criminal history category I, and guideline provision of life imprisonment.  A mandatory minimum sentence of 15 years must be imposed.  There is one outstanding objection by the Government concerning the JVTA assessment and we take no position.

Mr. Hambley stands by his plea; he acknowledges his guilt, accepts responsibility for his actions and nothing in this Position on Sentencing submission is intended or should be interpreted to diminish the wrongfulness of his conduct or acceptance of punishment for his crimes. Notwithstanding the foregoing, Mr. Hambley respectfully submits that the mitigating factors that

will be discussed in this submission warrant a 17-year sentence. This requested sentence reasonably and appropriately accounts for each of the factors set forth in 18 U.S.C. § 3553(a) to be discussed in more detail below.

Mr. Hambley further requests a recommended placement at a Sex Offender Management Program ("SOMP") facility, specifically FCI Petersburg, so he may participate in Sex Offender Treatment Programs prior to his release.

## INTRODUCTION

There are two different types of people in this world. Some are inherently evil who go out of their way to intentionally harm others. And there are others who are good people who find themselves going down a rabbit hole until their life spirals out of control to the point that they do not even recognize themselves anymore or understand the reasons for their admitted criminal conduct. Mr. Hambley is the latter. He is a good person, who has always gone out of his way to help others and tried to do the right thing until his life completely turned upside down. He went from a structured regimented environment in the Navy to life as a civilian which he was not equipped to handle due to his underlying mental health issues of which he was unaware. Mr. Hambley did not know that this life altering shift from the Navy to civilian life would permanently impact his life for the worse. Having said that, Mr. Hambley knows that only he is to blame for the crimes that he has committed and that nothing presented in this submission excuses his criminal behavior.

From the outset of this case, rather than fight the charges or provide excuses for his conduct, Mr. Hambley confronted his issues and even before his arrest voluntarily initiated sex offender therapy. It has been difficult for him to comprehend and reconcile how he came to victimize his stepdaughter, wife, and the other victims. Having participated in sex offender therapy for the

months between the execution of the search warrant at his home and his arrest, approximately December 2024 through April 2025, and undergoing evaluations administered by various experts in psychiatry, autism, and neuropsychology, he is beginning to understand the underlying reasons for his crimes. The sex offender therapy and forensic experts' evaluations have provided clarity for him to begin to comprehend how he committed the crimes to which he has pleaded guilty.

## 18 U.S.C. § 3553(a) – Factors to Consider at Sentencing

Since the Supreme Court decision in *United States v. Booker*, district courts have not been bound to sentence within the determined guidelines range. 543 U.S. 220 (2005). Instead, the guidelines have become a factor which judges are instructed to take into account when determining an appropriate sentence. Courts are permitted to tailor the sentence in consideration of other statutory concerns. *Id*, at 245. With that in mind, the factors to be considered pursuant to §3553(A) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentence range established for –
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[;]
>
> (5) any pertinent policy statement;
>
> (6) the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(A)(1)-(7); *see also*, *Booker*, 543 U.S. 220.

In *Gall v. United States*, the Supreme Court emphasized the importance of an "individualized assessment based on the facts presented." 552 U.S. 38, 39 (2007). Essentially, *Gall* instructs the sentencing court that a Guidelines calculation is the **initial benchmark** for determining a sentence, but it is not the only consideration. *Id*. Indeed, the Second Circuit has confirmed that district courts "must form [their] own view of the nature and circumstances of the offense and the history and characteristics of the defendant," and it is "**emphatically clear**" that the guidelines are "**truly advisory**." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (internal quotation marks omitted) (emphasis supplied). Relatedly, the Supreme Court has made evident that a district court judge may depart – upwards or downwards – from the guidelines, as long as serious consideration is given, and an explanation is provided as to the unusually lenient or harsh sentence; extraordinary circumstances are no longer required. *Gall*, 552 U.S. at 46.

## I.    <u>Nature and Circumstances of the Offense</u>

The facts and circumstances of the offense are accurately and thoroughly set out in the "The Offense Conduct" section of the PSR (¶11) and in Mr. Hambley's Statement of Facts. Therefore, there is no purpose served to repeat them in this brief. Mr. Hambley instead incorporates by reference the facts giving rise to the instant offense included in the PSR. Mr. Hambley recognizes the severity of his conduct and took full responsibility for his crimes from the time of his arrest. From the moment law enforcement arrived at his home to execute the search warrant, he cooperated with law enforcement and voluntarily spoke to the officers at his home.

Mr. Hambley's immediate disclosures and admissions expedited law enforcement's investigation and his eventual arrest.

## II.     Mr. Hambley's Medical/Psychiatric Diagnoses

When Mr. Hambley first contacted our office after the execution of the search warrant and before his arrest, it soon became evident to the attorneys representing him that there was something not yet known about Mr. Hambley that might explain his serious criminal conduct.  A person with Mr. Hambley's impressive background and accomplishments in the Navy, a pristine record, no prior contact with the law, a member of the military with top security clearance very rarely finds himself in a situation of this magnitude.  Following an initial psychosexual evaluation that occurred even prior to his arrest following the search of his home and seizure of his devices administered by Stephen C. Ganderson, Psy.D., a Certified Sex Offender Treatment Provider, it became clear that further evaluations and testing were critical.  *See* January 25, 2025 Stephen C. Ganderson, Psy.D., CSOTP Psychosexual Evaluation, attached as Exhibit A.  Before the completion of Rule 16 discovery, Dr. Ganderson offered the following preliminary opinion: "Mr. Hambley appears to be an offender who will be compliant and who can be safely managed in the community, particularly if he participates in sex offender treatment, therapy, abstinence of pornography, alcohol, and drugs, as well as undergo a psychiatric evaluation." *Id*, at 11 – 12.

Significantly, all experts who have evaluated Mr. Hambley have unanimously agreed that with adequate treatment, he is unlikely to reoffend and that his disorders can be managed and treated effectively.

### A.  James E. Sellman, M.D. and Associates, P.C. Psychiatric Evaluation

James E. Sellman, M.D., was retained to undertake a psychiatric evaluation following Dr. Ganderson's evaluation and recommendation.  On July 18, 2025, Dr. Sellman met with Mr.

5

Hambley at the Western Tidewater Regional Jail. The evaluation included an individual assessment, review of history, a thorough psychiatric evaluation, medical history and interviews with Mr. Hambley's wife. *See* James E. Sellman, M.D. and Associates, P.C. Independent Psychiatric Evaluation, attached as Exhibit B. at 1.

During Dr. Sellman's evaluation it was revealed that Mr. Hambley's family of origin suffered from significant mental illness. *Id*, at 2. Mr. Hambley's cousin, as well as his brother and sister, all have significant mood disorders, best described as bipolar disorder. *Id*. Mr. Hambley as well as his siblings have experienced the following, including but not limited to significant depression, problems regulating their diets, insomnia, feelings of restlessness, and difficulties dealing with daily stress. *Id*, at 2 – 3. In addition, Mr. Hambley disclosed that when he was young, he hit his head in a swimming pool causing at least one significant brain injury. *Id*, at 3. This injury was exacerbated over the next few years while he was playing soccer. *Id*. Overall, Dr. Sellman diagnosed Mr. Hambley with the following: Bipolar II, Autism Spectrum Disorder, Generalized Anxiety Disorder, Attention Deficit Disorder, predominately inattentive presentation, and Cognitive Disorder. *Id*, at 5.

Dr. Sellman provides an analysis of his specific clinical findings of Mr. Hambley's diagnoses. First, the diagnosis of bipolar II disorder is based on family history and manifested symptoms which were aggravated by his brain injury as well as Mr. Hambley's primary care physician's choice of medication, Celexa. *Id*. Second, the autism spectrum disorder diagnosis has adversely affected his communication actions with other people throughout his life, which will be addressed in more detail *Infra* **II.B.** *Id*. Third, Traumatic Brain Injury resulted from injuries from the age of 11 through adolescence. *Id*, at 6. More specifically, Mr. Hambley's executive functions have shown decline due to inappropriate medications that he received, creating more agitation and

irritability.  *Id*.  **These symptoms include increasing behavioral dysregulation, decreased effective problem-solving, organization and planning and self-monitoring, deceased self-awareness, impaired self-control, and social inappropriateness.**  *Id*.  Fourth, Generalized Anxiety Disorder has caused Mr. Hambley restlessness, frequently being easily fatigued, difficulty concentrating and insomnia.  *Id*.  Finally, an MRI was performed on Mr. Hambley, which revealed that there are two abnormalities in the white matter.  *See* MRI Report, attached as Exhibit C.  In other words, the white matter suggests possible underlying structural nervous system problems related to chronic depression and other psychiatric symptoms.  *See* Ex B, at 6.

Notwithstanding the foregoing, Dr. Sellman maintains that "guilt and remorse are clearly evident as [Mr. Hambley] takes responsibility for his behavior."  *Id*.  As a result, Mr. Hambley is a likeable, non-violent, intelligent and capable man with significant strengths.  *Id*.  Because of this, Dr. Sellman concludes to a reasonable degree of medical certainty that with adequate psychiatric treatment for all of Mr. Hambley's symptoms, his conditions can be successfully ameliorated with secondary significant clinical improvement in function providing him with a sound foundation to move forward positively, both with a career and social relationships in the future.  *Id*, at 11. (emphasis added).

## B. David C. Gavisk, Ph.D., BCBA, Spectrum Therapy Forensics Autism Evaluation

Following an evaluation for autism spectrum disorder ("ASD") performed by David C. Gavisk, Ph.D., BCBA on Mr. Hambley, it was determined that he meets the criteria for ASD.  *See* December 10, 2025 David C. Gavisk, Ph.D., BCBA Autism Evaluation, attached as Exhibit D, at 30.  The evaluation included a number of different tests and assessments.  Importantly, Mr. Hambley exceeded cutoff criteria on the Autism Diagnostic Observation Schedule-2 ("ADOS-2") and the Autism Diagnostic Interview Revised ("ADI-R"), both of which are foundational parts of

7

an evaluation for autism. *Id.* Overall, Mr. Hambley shows many autism traits, including difficulty with emotional control and the development of friendships, some narrowly focused and intense interests, and struggling to understand the motivations, verbal meaning, and emotions of others. *Id*.

The assessments and interview data collected similarly confirmed a diagnosis of autism and specifically revealed several important features of Mr. Hambley's ASD that influenced behaviors leading to his arrest. *Id.* Data from the ADI-R indicated that Mr. Hambley, from a young age, had difficulty accepting certain social norms and integrating them into his thinking. *Id.* Oftentimes, Mr. Hambley's approach is to take the first solution to a problem that sounds workable and pursue it wholeheartedly. *Id.* Whether the solution is socially acceptable or even legal is not considered in the initial calculus nor is it ever considered during the process of implementing the plan. *Id*, at 31. **Here, Mr. Hambley saw an opportunity to help an ex-girlfriend who was having monetary problems, and he dove into a bad solution without considering potential consequences for the ex-girlfriend, her children, or his wife and family, and even for himself.** *Id*.

An additional factor that contributed to the problem was Mr. Hambley's interest in pornographic material. *Id.* Mr. Hambley developed this interest while in the Navy, and he described the culture around it as one of continual escalation. *Id.* As a result, Mr. Hambley grew to desire not just the material itself, but the escalating transgression as well. *Id.* Mr. Hambley's retirement from the Navy presented a serious problem, forcing him to adjust to a different life. *Id.* Because of this, Mr. Hambley felt stress from leaving an entirely predictable and dictated life and was put on medical hold for counseling. *Id.* Even though he was eventually prescribed Celexa, a common anti-depressant that is also effective for anxiety, he continued to struggle with the feeling

that he lost an important part of himself. *Id*. While Mr. Hambley would not be able to regain the structure and routine of military life, he was able to regain the familiar comfort of pornographic imagery, which Mr. Hambley pursued as an attempt to reduce his stress and anxiety. *Id*. Since Mr. Hambley was exposed to the most disturbing images and videos while he was in the Navy, he did not find the legally permissible easily obtained pornography satisfactory. *Id*, at 31 – 32. Thus, when an opportunity to "help" a former girlfriend financially also became a chance to relive his Navy experiences, Mr. Hambley viewed it as a coping mechanism that would reduce his anxiety. *Id*, at 32.

While ASD is a life-long condition that cannot be cured, the symptoms of the disorder can be mitigated. *Id*. **Dr. Gavisk confirms that Mr. Hambley can certainly learn to control his behaviors and be a contributing member of society**. *Id*. Moreover, having ASD does not increase the risk of reoffending behavior. *Id*, at 33. In fact, research has established the opposite. *Id*. The concrete, literal nature and strict adherence to rules/routines may make those with ASD less likely to reoffend once they are clearly taught the social/legal rules. *Id*, at 33 – 34. Given Mr. Hambley's work ethic, his adherence to rules that he knows and understands, and the strong support of family, **Mr. Hambley is extremely unlikely to reoffend if he receives adequate therapy for his ASD**. *Id*, at 34. A combination of ABA therapy to address his social and emotional deficits, the structure and routine of work, and continued family support offer the best possible outcomes for both Mr. Hambley and society. *Id*.

### C.  Bernice A. Marcopulos, PhD, ABPP Neuropsychological Evaluation

On January 22, 2026 Mr. Hambley completed a neuropsychological evaluation conducted by Bernice A. Marcopulos, Phd, ABPP at the Western Tidewater Regional Jail. *See* February 2, 2026 Bernice A. Marcopulos, Phd, ABPP Neuropsychological Evaluation, attached as Exhibit E,

at 9.  The evaluation revealed that his IQ measured in the above-average range with very strong visuospatial reasoning abilities, consistent with the technical and analytical skills he demonstrated in his job as a program analyst of complex missile defense systems in the Navy.  *Id*.  The evaluation further confirmed that Mr. Hambley's verbal memory was average, affected by an inefficient learning strategy and dysexecutive errors.  *Id*, at 10.  He also demonstrated mild impulsivity and an orderly, inflexible problem-solving style as well as mild weakness in executive functioning.  *Id*.

**Ultimately, Dr. Marcopulos concluded that around the time of the offenses, Mr. Hambley was suffering from several significant mental health conditions that impacted his behavior**.  *Id*.  Mr. Hambley was suffering from severe mood disorder and struggling to adjust to civilian life after retiring from the military and he was also diagnosed with autism spectrum disorder.  *Id*.  Yet, even with these diagnoses, Dr. Marcopulos maintains that these mental health disorders can be managed and treated effectively with therapies and medications.  *Id*.

### III.    Mr. Hambley's Background, Character, and Reputation

We respectfully submit that all the facts and circumstances of Mr. Hambley's life and character serve as powerful mitigation and strongly support a below guidelines sentence of 17 years.  Mr. Hambley has dedicated his life to serving his country and ultimately retired with honors and a pristine record.  His nature and character are exemplified through the many letters written on his behalf that have been attached to this submission.

#### A.  Personal Background

Who is Cory Hambley?  Mr. Hambley was born in Port Jefferson, New York to parents Charles and Carol Hambley.  He had a typical childhood with an older brother, Charles, and a sister, Carly, who is three years younger.  Mr. Hambley was fortunate to have extended family

around throughout his upbringing. His maternal grandparents, as well as his aunt and uncle, lived locally and were regularly involved in his daily life.

As a child, Mr. Hambley attended United Church Preschool in Sayville, New York. He then went to Blue Point Elementary School, where he excelled and obtained high marks in all his courses. During his time there, he was fortunate to be selected for the Kidsday News program which was created specifically for children by the local newspaper *Newsday* and interviewed Howie Mandel. Additionally, Mr. Hambley was chosen to lay a wreath at Arlington National Cemetery while on his fifth-grade school trip. During his early childhood, Mr. Hambley enjoyed playing soccer, roller hockey, and fishing.

When Mr. Hambley was about 10 years old, tragedy struck his family. Mr. Hambley's first cousin, Philip, came to live with him because his parents, Mr. Hambley's aunt and uncle, passed away within a year of each other. While Mr. Hambley was excited to have a new member of the family, it was a significant adjustment for him. Not long after Mr. Hambley's cousin moved into his family home, his grandmother suddenly passed away, triggering a difficult time for the family in dealing with multiple deaths within a short period of time.

That same year, Mr. Hambley began James Wilson Young Middle School in Bayport, New York and discovered his love for boats. He would spend the summer on boat trips throughout the New England coastline with various family members. By the time he reached high school, he enjoyed ice hockey and took the opportunity to explore his independence. Particularly, he liked being responsible for himself and consistently maintained employment once he was old enough. During the summers he worked two different jobs. Some of his first employment opportunities included working at a local ice rink, a pool installation company, and Blockbuster Video. By the summer of 2000, Mr. Hambley expressed his interest to enlist in the United States Navy. And

from that point onward, Mr. Hambley remained dedicated to accomplishing that goal. **Throughout Mr. Hambley's life until the instant offense, he never got into trouble with the law, was well-behaved, and responsible**.

### B.  Mr. Hambley's Professional Accomplishments and Adult Life

Mr. Hambley enlisted in the Navy under the Delayed Entry Program ("DEP") at age 17 in 2000 but did not begin Boot Camp (training camp) until after high school graduation in 2001.  For twenty years, Mr. Hambley served this country with distinction and honor in the Navy as an Aegis Fire Controlman from 2001 to 2021.  An Aegis Fire Controlman is a maintainer and operator of the Aegis Weapon System ("AWS"), which is a multi-mission naval weapons system.  The hardware and its companion computer program software are installed on Aegis Guided Missile Cruisers and Destroyers in the US Navy.  As a result of this important responsibility, Mr. Hambley was given Secret Clearance in support of his duties.

In 2002, Mr. Hambley completed Boot Camp and began his career on the USS Oscar Austin ("DDG 79"), homeported in Norfolk, Virginia.  He was swiftly promoted and participated in five overseas deployments, serving as a maintenance technician.  Due to his expertise, he qualified as a Missile System Supervisor ("MSS") where he was responsible for weapon release of standard missiles on the ship.  He also was trained as the Combat Systems Officer of the Watch ("CSOOW") where he was tasked with the coordination and execution of the maintenance and repair of all combat systems equipment.  Throughout this time, Mr. Hambley similarly was required to maintain Secret Government Security Clearance in order to perform these tasks.

From 2007 to 2011, Mr. Hambley cross-decked[1] on the USS Cole.  On USS Cole, Mr. Hambley was promoted again and qualified as the Combat Systems Coordinator ("CSC") where he was responsible for the entire Aegis Weapon System's tactical employment in all mission areas (Surface, Integrated Air and Missile Defense, Ballistic Missile Defense, Strike, and Anti-Submarine).  He also qualified and served as Anti-Air Warfare Coordinator ("AAWC") where he was in charge of the defense of the ship from cruise missile threats.  Due to his outstanding performance, he received an award from his Commanding Officer for completing lifesaving CPR on one of the ship's officers who suffered from a medical emergency.

Eventually, Mr. Hambley transferred to Pearl Harbor, Hawaii for shore duty where he served as an instructor, teaching maintenance and tactical employment of the Aegis Weapon System to over 800 sailors on 14 ships.  It was also around this time that Mr. Hambley met, Shawna Hambley, his current wife.  In this role, he obtained his Master Training Specialist qualification and was Instructor of the Year in 2013.  Due to his success serving in this capacity, he was widely recognized as a subject matter expert for Aegis Ballistic Missile Defense and was designated to commission the Navy's first Aegis Ashore site in Romania.

Finally, in 2014, Mr. Hambley transferred back to Norfolk and was part of the first certified and deployed operational watch team for Aegis Ashore Romania.  Aegis Ashore Romania is the first of two sites that are part of the European Phased Adaptive Approach in Defense of Europe. Mr. Hambley served as both the Missile System Supervisor and Combat Systems Officer of the Watch for two deployments.  Upon completion of his second deployment to Romania, Mr. Hambley was promoted to Chief Petty Officer/E-7 and was once again hand selected to serve as

---

[1] Cross-deck (or cross-decking) is naval jargon which refer to informal, ad-hoc sharing of resources between naval vessels allies.  *See,* Wikipedia: Cross-deck (Naval Terminology), https://en.wikipedia.org/wiki/Cross-deck_(naval_terminology), last accessed May 16, 2025.

the Combat Systems Maintenance Manager ("CSMM") for the pre-operational Aegis Ashore Poland site.  As CSMM, Mr. Hambley participated in one deployment where he oversaw the installation and testing of all Aegis Weapon System equipment on site.

In 2021, Mr. Hambley retired as an E-7, Chief Petty Officer, and was honorably discharged with a pristine record after serving 20 years in the Navy.  *See* July 21, 2021 Cory Hambley Certificate of Release from Active Duty, attached as Exhibit F, at 1.  **Throughout his 20-year career in the Navy, he was never disciplined, and his supervisors consistently praised him when it came to performance of his duties**.  *See* April 28, 2025 Letter from Adam Goldberg, attached as Exhibit G.  Upon retirement, he was immediately hired as a program analyst supporting the Missile Defense Agency ("MDA") and Aegis Sea-Based Weapon Systems Program Office.  In this position he was responsible for test and performance analysis of the Aegis Ballistic Missile Defense Weapon System, which also required Secret Clearance.  Most recently, in 2022, Mr. Hambley decided to transition to a government civilian role as a program analyst for the Missile Defense Agency.  He served as the primary analyst and point of contact to provide Aegis Weapon System performance for the MDA.  He was the principal point of engagement for Combatant Commander Staff, Chief of Navy Operations Staff, and other external stakeholders to receive critical performance data.[2]  During his time in this role, he maintained a Top Secret/Special Compartmented Information (TS/SCI) Clearance until his eventual resignation.

Mr. Hambley resigned from the government in December 2024 following the execution of the search warrant at his home in November 2024.  He did not sit around but instead entered a program in January 2025 that he hoped would lead to obtaining his Master's Degree in Business Finance at University of Arizona's Global Campus.  Despite Mr. Hambley's ongoing legal issues

---

[2] For a complete overview of Mr. Hambley's professional experience, his resume is attached.  *See* Cory Hambley Resume, attached as Exhibit H.

and while he still had the opportunity, he continued to prioritize his education as well as his volunteer commitments to help those less fortunate in his community.

### C.  <u>Mr. Hambley's Character and Reputation</u>

#### 1.  **Volunteer Commitments**

Since November 2021, Mr. Hambley has been a volunteer firefighter at the Upper Middlesex Fire Department, Inc. (UMVFD).  Throughout his time volunteering, he remained an active member in good standing.  *See* Letter from Patrick Burch, attached as Exhibit I.  Mr. Hambley is truly passionate about fire service and that was evident to his colleagues.  Mr. Burch, Assistant Chief of Operations at UMVFD, observed that Mr. Hambley "consistently demonstrated dedication and commitment to the department" and "actively participated in fundraisers, training sessions, emergency calls, and various community events."  *Id*.  There is no question that his involvement had a meaningful impact on the department as well as the general public.  *Id*.

Mr. Hambley's devotion to helping others did not stop there.  He also regularly volunteered at Habitat for Humanity Middlesex, Inc. in support of the Food Pantry and the Backpack Buddy program.  *See* Letter from Greg Chambers, attached as Exhibit J.  This program provides students at local schools with nutritious and healthy food to take home on weekends that otherwise cannot afford it.  *Id*.  The way that Mr. Hambley chose to spend his spare time is not only noble but truly impactful and important work.  Without people like him, these volunteer programs would not be able to survive.  His dedication to helping his community is a quality that has been characteristic of Mr. Hambley from a very young age.

#### 2.  **Mr. Hambley's Exemplary Character**

Mr. Hambley is known among his family and peers to be a thoughtful, kind, respectful, and generous person who regularly helps friends and those in need whenever he had an opportunity to

do so.  *See* February 6, 2026 Letter from Carly Kirk, attached as Exhibit K; *see also*, Letter from Tom Biedermann, attached as Exhibit L and February 6, 2026 Letter from Shari DeFreese, attached as Exhibit M.  His immediate family members personally recount numerous instances of Mr. Hambley's generosity.  In past years, Mr. Hambley offered his friends to live in his home when they needed a place to stay, whether it was for a short period of time or during a divorce.  *See* Ex. K.  He was also very involved in his stepson's life who has autism and is unable to live independently.  *Id*.  Mr. Hambley even welcomed his parents into his home so they could be closer to his family, while also covering many of their household expenses.  *Id*.  He often sends money to his brother to help with his expenses, bought groceries for a high school friend who needed some extra help, and paid off his friend's mortgage so that he would not face foreclosure.  *See* February 6, 2026 Letter from Carol Hambley, attached as Exhibit N, at 2.  These are just a few examples of the many kind gestures that have been a constant throughout Mr. Hambley's life.

Friends close to Mr. Hambley are acutely aware of the time he spends volunteering in the community to make it a better place, specifically his involvement at the local food bank, fire department, and assisting with local elections.  *See* Ex. L.  Also, prior to his arrest, Mr. Hambley was in the process of restoring an old schoolhouse that the community used for local events.  *See* February 4, 2026 Letter from Janet Bastiaanse and Richard Hambley, attached as Exhibit O.

Even those who came into contact with Mr. Hambley more recently in a professional environment, approximately five years ago, noticed his respectful nature and the value he places on his relationships.  *See* Letter from Robin McBrayer, attached as Exhibit P.

Despite the disappointment and shame in learning of the charges against him, all of those close to Mr. Hambley overwhelmingly agree that the crimes he committed are not indicative of who Mr. Hambley is as a person, and more importantly, they all believe that he is capable of

rehabilitation.  *See* Exs. K, O, and P.  This is because of Mr. Hambley's "unwavering commitment to hard work."  *See* February 4, 2026 Letter from Charles Hambley, attached as Exhibit Q.  Mr. Hambley approaches challenges in his life with determination, and his desire to overcome his recent behavior would be tackled no differently.  *Id.*

Mr. Hambley himself wrote a letter to Your Honor expressing his sincere remorse.  He acknowledges that his actions have terribly impacted the victims physically and emotionally in more ways that he could fathom.  *See* Letter from Cory Hambley, attached as Exhibit R, at 1. During the last year that he has been incarcerated, he has been dedicated to bettering himself by engaging in therapy, embracing his faith, and actively making efforts to rehabilitate himself.  *Id.* However, ultimately, Mr. Hambley recognizes that there is "no justification for the unjustifiable." *Id*, at 2.

## IV.   **Deterrence**

Congress further directs the Court to consider the need to foster deterrence and promote respect for the law and to protect the public from further crime.  Deterrence is classified into either general or specific deterrence.  With respect to general deterrence, that is the deterrence of other individuals who may contemplate criminal behavior, that goal is met by the sentence recommended by the Defendant.  The notion of spending any amount of time behind bars is daunting, and any individual considering criminal activity **should** be dissuaded upon the knowledge of the penalty.

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime.  *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that

17

increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects…Three National Academy of Science panels reached that conclusion, as has every major survey of the evidence."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year timeframe").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level…While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004). According to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Importantly, the requested sentence is more than enough to specifically deter Mr. Hambley from repeating his actions. Repeat offenders sometimes have little qualms about spending time in prison, knowing that release is in their future. For **Mr. Hambley, who has never spent time in**

**custody**, the experience so far has been isolating and frightening. While his conditions and opportunities will likely improve once he is moved into the Bureau of Prisons, Mr. Hambley faced incredible difficulty adjusting to incarceration, which has further exacerbated his preexisting diagnosed anxiety.

The stark reminder of his experience in prison will be present in his mind when considering whether or not to reoffend—a mental connection that is often lost on other offenders and a leading cause of recidivism. For Mr. Hambley, the punishment aspect will encourage him to remain lawful and to not repeat his mistakes once again. Furthermore, 17 years of incarceration will certainly protect the public from further crime. For someone facing a lengthy prison sentence, it is difficult to fully comprehend that length of incarceration. Yet, Mr. Hambley has been aware of the penalties and the time associated with these charges since his arrest. He is prepared to serve his sentence, and the general public will certainly be protected during that time.

Incarceration for an individual such as Mr. Hambley is markedly different from other defendants due to his lack of any criminal history. He is not an individual who has been in-and-out of the court system and who may view prison as a revolving door. One day in prison for Mr. Hambley is significant, a fact that he has already learned and experienced in pre-trial custody at Western Tidewater Regional Jail. Accordingly, a sentence of 17 years' incarceration is an appropriate disposition in this case. For Mr. Hambley, in consideration of his background and individual characteristics, it is a significant indisputably lengthy sentence that meets the goals of Congress.

## <u>CONCLUSION</u>

For the reasons set forth herein, Mr. Hambley respectfully requests that this Court sentence him 17 years, as that would provide sufficient punishment, consistent with the sentencing factors

enumerated in 18 U.S.C. § 3553(a) commensurate with his role and conduct. A 17-year sentence would be sufficient, but not greater than necessary, to achieve the statutory aims imposed by the sentencing guidelines while upholding respect for the law. It is just punishment for the offense based on all the facts, circumstances and considerations relevant and material to this case.

DATED:        March 4, 2026
              New York, New York

                                        Respectfully submitted,

                                        Cory Richard Hambley
                                        By Counsel

                                        _____/s/_____
                                        Robert Curtis Gottlieb
                                        NY Bar#: 1118975
                                        GOTTLIEB TOWNSEND
                                        111 Broadway
                                        Suite 701
                                        New York, NY 10006
                                        212-566-7766
                                        Fax: 212-428-6755
                                        rgottlieb@gottliebtownsend.com
                                        *PRO HAC VICE*

                                        _____/s/_____
                                        S. Mario Lorello
                                        VSB# 80629
                                        Counsel for Cory Hambley
                                        ZOBY & BROCCOLETTI, P.C.
                                        6663 Stoney Point South
                                        Norfolk, VA 23502
                                        (757) 466-0750
                                        (757) 466-5026
                                        mario@zobybroccoletti.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of March, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Rebecca Gantt, Esquire
Assistant U. S. Attorney
Office of the U. S. Attorney
101 W. Main Street, Suite 8000
Norfolk, VA 23510

<u>/s/ S. Mario Lorello</u>
S. Mario Lorello
VSB# 80629
Counsel for Cory Hambley
ZOBY & BROCCOLETTI, P.C.
6663 Stoney Point South
Norfolk, VA 23502
(757) 466-0750
(757) 466-5026
mario@zobybroccoletti.com

21