IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:25-cr-44 |
| | ) | |
| CORY RICHARD HAMBLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING AND
MOTION FOR ACCEPTANCE OF RESPONSBILITY DECREASE**

The United States of America, by and through its attorneys, offers the following with
respect to the sentencing factors under 18 U.S.C. § 3553(a) and the U.S. Sentencing Guidelines
("USSG" or "guidelines").

There are no objections to the Presentence Investigation Report ("PSR") advisory
guidelines range, which correctly determined an offense level of *49* (well above the maximum end
of the guidelines table) and criminal history category of I, resulting in an advisory guidelines range
of life imprisonment. Considering the applicable sentencing factors under 18 U.S.C. § 3553(a),
the government submits that a sentence of imprisonment within this guidelines range of life would
be sufficient but no greater than necessary to accomplish the purposes of sentencing set forth in 18
U.S.C. § 3553(a).

While the government recognizes the severity of a life sentence and does not take this
request lightly, such a sentence is necessary to protect the public from the defendant and to punish
him for his horrific conduct. As the U.S. Magistrate Judge found in ordering the defendant's
detention, the defendant acted with "grave depravity." ECF No. 40 at 5. The defendant, who held
a Top Secret security clearance and worked in missile defense for the U.S. Navy, was married, and

owned an expensive, 9-bedroom home, instigated a scheme whereby his ex-girlfriend, co-defendant Grace Paradis, recorded herself repeatedly sexually molesting two girls, then 5 and 9 to 6 and 10 years old, for the defendant's sexual gratification.  The defendant plied Paradis with rent money and the potential of future marriage to induce her to record herself showering with the girls and rubbing their breasts, shaving their pubic areas, and most diabolically, orally sodomizing them while they slept, on multiple occasions.  He also proposed Paradis drug the young girls to facilitate their sexual abuse.  The defendant and Paradis further drew up a contract specifying rules for grooming and molesting future children they would have together.

The investigation showed this was far from a one-time aberration—instead, the defendant is a serial child predator.  He surreptitiously recorded another child to whom he had access masturbating, and, in an apparent grooming effort, sent her a video of her mother performing oral sex on the defendant and sought to have her mother take photos of her.  He also possessed 1,155 images and 142 videos of other child sexual abuse materials.  In addition to all of that activity, the defendant surreptitiously recorded two adult victims years before (both of whom served in the Navy with him).  In sum, he has engaged in egregious, illicit conduct for nearly 20 years.

The government has one objection regarding the financial penalties in the PSR—namely, the applicability of the penalty in the Justice for Victims of Trafficking Act of 2015 ("JVTA").  Although this statute lapsed following the defendant's guilty plea, it was in effect during his offense conduct, at the time he pleaded guilty, and has since been reinstated and remains in effect.  Further, he agreed to the imposition of the same in his plea agreement.

The government also submits that the Court should give little weight to the five mental health evaluations the defendant submitted, which generally fail to account for either the full scope of the defendant's criminal conduct or for his long history of high performance in the military (or

both), and instead rely on the defendant's own self-serving, minimizing statements.  One report referenced in the PSR, for example, characterizes the defendant's conduct as merely "viewing" child pornography, and another describes his conduct as "help[ing] a former girlfriend financially." The psychosexual report states there was no "contact offense."  And a neuropsychological report describes him as simply having a "pornography addiction."  Further, none opine that any mental health conditions caused his specific criminal conduct, as the Fourth Circuit requires.  In any event, none of his purported mental health conditions are sufficient to mitigate the gravity of his conduct, the need for just punishment, and danger to the community.

## I.    Procedural Background

On April 16, 2025, a grand jury returned an indictment charging the defendant with ten counts: conspiracy to produce visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2251(a) (Count 1), two counts of production of child sexual abuse material, in violation of 18 U.S.C. § 2251(a) (Counts 2 and 3), two counts of distribution of child sexual abuse material, in violation of 18 U.S.C. § 2252(a)(2) (Counts 4 and 5), three counts of possession of child sexual abuse material, in violation of 18 U.S.C. § 2252(a)(4)(A) and (b)(2) (Counts 6 through 8), and two counts of use of an interstate commerce facility to entice a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b) (Counts 10 and 11).  ECF No. 3.

The defendant was arrested on April 24, 2025, had his initial appearance the same day, and was ordered temporarily detained.  ECF Nos. 10.  The defendant initially waived his right to an immediate detention hearing, ECF No. 24, but proceeded with an arraignment and detention hearing on May 28, 2025.  ECF No. 38.  At the hearing, the defendant relied on a report and testimony by Dr. Ganderson (which report he is also submitting for sentencing).  ECF No. 35.  The

U.S. Magistrate Judge found that insufficient to mitigate the defendant's dangerousness, noting the report's failure to account for offense conduct, and ordered him detained.  ECF No. 40.

On September 3, 2025, the defendant pleaded guilty before the Court to Counts One and Ten.  ECF Nos. 52 & 53.  The Court initially scheduled the sentencing hearing for January 7, 2026, ECF No. 52, but continued the sentencing hearing to March 2026 at the defendant's request to allow more time to obtain "neuropsychological testing," ECF No. 65 at 2, ECF No. 66.

On February 23, 2026, the U.S. Probation Office filed a PSR which calculated the defendant's total offense level as 47 and his criminal history category as I, resulting in a guidelines range of life imprisonment.  ECF No. 70 ¶¶ 89, 134, & 135.  The final sentencing PSR, filed on February 27, 2026, applied a 2-level offense level enhancement for the defendant's leadership role vis-à-vis his co-defendant Paradis, which increased the total offense level but did not affect the already maxed-out guidelines range, noted the government's JVTA objection, and added information from the defendant about new psychological evaluations.  ECF No. 72 at 47.  On March 4, 2026, the U.S. Probation Office filed another PSR noting restitution requests and victim impact statements.  ECF No. 75 at 47.

## II.     Motion to Grant the Defendant Additional One-Level Decrease for Acceptance of Responsibility

The defendant has assisted authorities in the investigation and prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.  USSG § 3E1.1(b).  The PSR has properly applied a two-level decrease in the offense level for acceptance of responsibility under USSG § 3E1.1(a), and the defendant's offense level prior to the operation of that section is level 16 or greater.  Accordingly, the United States moves this Court to apply an additional one-level reduction for

4

acceptance of responsibility pursuant to USSG § 3E1.1(b). This reduction is already reflected in the PSR's offense level calculation. PSR ¶ 88.

## III.     Objection to the Presentence Investigation Report

The government objects to the PSR's determination regarding the inapplicability of the financial penalty in the Justice for Victims of Trafficking Act of 2015 ("JVTA"). PSR at 38 & 48. The JVTA, codified in 18 U.S.C. § 3014, provides for a mandatory $5,000 special assessment for non-indigent defendants in certain crimes including, as relevant here, child exploitation.

Enacted in 2015, the JVTA was initially by its terms effective from 2015 through September 30, 2025. 18 U.S.C. § 3014(a). *Id.* ("Beginning on the date of enactment of the Justice for Victims of Trafficking Act of 2015 and ending on September 30, 2025, in addition to the assessment imposed under section 3013, the court shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense [including sexual exploitation and other abuse of children] . . . ."). This timeframe covers the time period of the defendant's offense conduct, his indictment, and guilty plea.

The JVTA was not renewed as of October 1, 2025. On November 12, 2025, the President signed the Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, which effectively amended Section 3014(a) to read, "[b]eginning on the date of the enactment of the Justice for Victims of Trafficking Act of 2015 and ending on January 30, 2026, . . . the court shall assess an amount of $5,000 on any non-indigent person . . . ." *See* H.R. 5371, Public Law 119-37, § 125, https://www.congress.gov/119/bills/hr7148/BILLS-119hr7148enr.pdf ("Section 3014(a) of title 18, United States Code, shall be applied by substituting the date specified in section 106(3) of this

Act [January 30, 2026] for "September 30, 2025": *Provided*, That notwithstanding section 119,[1] this section shall take effect on the date of enactment of this Act and shall not apply retroactively.").

The JVTA was again not renewed as of January 31, 2026, but on February 3, 2026, the President signed the Consolidated Appropriations Act, which eliminated the JVTA's sunset provision altogether. H.R. 7148, § 5012, https://www.congress.gov/119/bills/hr7148/BILLS-119hr7148enr.pdf ("Section 3014(a) of title 18, United States Code, is amended by striking 'and ending on September 30, 2025.'").

Thus, although the JVTA was not in effect for approximately a month-and-a-half in total—between October 1 and November 11, 2025, and between January 31 and February 3, 2026—the JVTA was in effect at all relevant times in this case: during the defendant's offense conduct, when he was indicted, at his plea hearing, and at his sentencing hearing. Further, he agreed in his plea agreement that the JVTA was applicable. ECF No. 53 ¶ 10.

Neither retroactivity principles nor the *Ex Post Facto* clause make this provision inapplicable. There is no retroactivity question regarding the JVTA because by its terms, it is in effect at the time of the defendant's sentencing as well as all prior relevant proceedings. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (defining a statute's "retroactive effect" as "impair[ing] rights a party possessed when he acted, increasing a party's liability for past conduct, or impos[ing] new duties with respect to transactions already completed"). That there was a short lapse while the defendant was pending sentencing does not alter this analysis: 1 U.S.C. § 109 provides that "[t]he expiration of a temporary statute shall not have the effect to release or

---

[1] Section 119 of the Act notes that for certain provision, the statute should be constructed to begin on October 1, 2025. Thus, the import of the notation regarding retroactivity is that the JVTA should not be construed to be in effect from the prior expiration (September 30, 2025) to the date of the Act's enactment (November 12, 2025).

extinguish any penalty, forfeiture, or liability incurred under such statute, unless the temporary statute shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability." *See generally, e.g.*, *Allen v. Grand Cent. Aircraft Co.*, 347 U.S. 535, 554-555 (1954). *See also United States v. Dixon*, No. 23-CR-90 (WFK), 2025 WL 3442994, at *4 (E.D.N.Y. Nov. 24, 2025) (noting the applicability of the JVTA in a sentencing on November 24, 2025, during a period when the JVTA was reinstated following the first lapse[2]).

As to the *Ex Post Facto* clause, U.S. Const. Art. I § 9, that operates only to prohibit penalties that were not in effect at the time of the defendant's conduct. *See Peugh v. United States*, 569 U.S. 530, 532–33 (2013) ("The Constitution forbids the passage of *ex post facto* laws, a category that includes '[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, *when committed*.'" (quoting *Calder v. Bull*, 3 Dall. 386, 390, 1 L.Ed. 648 (1798)) (emphasis added)). As noted, the JVTA was effective through the conduct in the counts of conviction (which spanned 2023 and 2024).

## IV.  Standards Governing Sentencing

In fashioning a criminal sentence, a district court must "first calculate the applicable [U.S. Sentencing] Guidelines range." *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007). After calculating the guidelines range, the district court "must give both the government and the defendant 'an opportunity to argue for whatever sentence they deem appropriate.'" *Id*. (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). The district court must then consider all of the factors set forth in 18 U.S.C. § 3553(a) to determine whether those factors support the sentence requested by either party. *Id*. (citing *Gall*, 552 U.S. at 49). In doing so, the district court may not

---

[2] The JVTA assessment was ultimately not imposed, presumably due to the defendant's indigency.

7

presume that a sentence within the guidelines range is reasonable. *Id.* (citing *Gall*, 552 U.S. at 50); *see also Nelson v. United States*, 555 U.S. 350, 351–52 (2009). Rather, the court "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

In the event that the district court imposes a sentence outside the guidelines range, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Pauley*, 511 F.3d at 473 (quoting *Gall*, 552 U.S. at 50). After deciding an appropriate sentence, the court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50. The Fourth Circuit has also held that "a sentencing court must address the parties' nonfrivolous arguments in favor of a particular sentence, and if the court rejects those arguments, it must explain why in a sufficiently detailed manner to allow this Court to conduct a meaningful appellate review." *United States v. Blue*, 877 F.3d 513, 519 (4th Cir. 2017).

## V.    The Statutory Sentencing Factors

### A.    The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

The defendant's offense conduct is diabolical. Investigators obtained a search warrant for the defendant's home in Water View, Virginia, in November 2024, following a tip from the National Center for Missing and Exploited Children (NCMEC) that the defendant had shared child sexual abuse material (CSAM) on the social media application X. He admitted to receiving videos of "inappropriate touching" of two girls, MV1 and MV2, via the Signal application from his ex-girlfriend, co-defendant Grace Paradis.

The following month, agents arrested Paradis and found a slew of Signal messages on her phone with the defendant.[3] The defendant re-initiated contact with Paradis in November 2022,

---

[3] A PDF extraction of these messages with text only, which was provided to the defendant in discovery, spans 4,919 pages.

asked her to install Signal, mailed her a camera that would live-stream, and almost immediately began asking her to record sexual abuse of MV1 and MV2. When those conversations began in January 2023, MV1 was 5 years old and MV2 was 9 years old. He noted he "like[d] incest stuff" and suggested she set up the camera he bought for her to record herself in the shower with MV1 and MV2. He told her he wanted to see if "their pussy is a[s] pretty as yours."

In February 2023, after Paradis revealed she was behind on rent, the defendant said he could get her a check if Paradis would send him images of MV1 and MV2. After Paradis expressed worries that they might notice what she was doing, he proposed that she drug the children with Benadryl or roofies. Paradis recorded a video of MV1 and MV2 showering later that month, and the defendant told her that although it was "amazing," she "could have been a little more hands on" and in addition to washing their hair, should have washed their public areas.

The defendant continued to escalate the proposed abuse. On February 20, 2023, he said he wanted one of the victims to sleep in the room with Paradis "and when she's passed out i wanna see you sneak a little taste of her." He offered to exchange a video of himself ejaculating in exchange for watching Paradis orally sodomize either of the girls. In March 2023, the defendant agreed to send Paradis a check for her rent after telling her she needed to do things in exchange, like showering with MV1 and MV2 and getting them "soapy." In May 2023, the defendant told Paradis to send pictures of her bathing MV1 and MV2, who were then 6 and 10 years old.

Later that month, after Paradis revealed the younger girl, MV1, was passed out her in bed, the defendant told Paradis to strip MV1 and take a picture of her with her fingers on MV1's genitalia, and to take a video of her "licking" MV1, which Paradis did. The next morning, the defendant told Paradis he had "massive orgasm" as a result. A month later, the defendant told Paradis he wanted to see her "lick the lil again."

On the defendant's electronic devices, investigators located multiple depictions of MV1 and MV2's abuse, including both being orally sodomized and also being rubbed, shaved, and bathed by Paradis. This conduct continued for a year–in December 2023, the defendant and Paradis discussed how to transfer an hour-long video of MV1 and MV2 showering.

The defendant's electronic devices revealed other child sexual abuse. Seven years before his abuse of MV1 and MV2, the defendant similarly sought to have his wife "fool around" with a girl, MV3, and take pictures. As with Paradis, he leveraged her desire to be with him to try to get what he wanted, telling her to get the pictures if she wanted to be in a relationship with him. They married several months later. MV3, now an adult, told investigators that the defendant made graphic comments about her body, was found standing in her bedroom when she finished showering, and sent her a video of the defendant's wife performing oral sex on the defendant. There were several sexually explicit images of MV3 found on the defendant's devices, including a surreptitious video he made of her masturbating.

Additionally, the defendant was a prolific collector of other CSAM, and possessed 1,155 images and 142 videos of CSAM. He also surreptitiously recorded two adult victims, both of whom served in the Navy with him. One of these victims, who had a relationship with the defendant, described him as "sadistic."

B. The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))[4]

The defendant's background yields little explanation for his sustained and deliberate child sexual abuse. The defendant is 43 years old. He was born and raised in New York by his parents, who remain married. They live in the defendant's property in Virginia and are supportive of the defendant. The defendant describes having an "idyllic upbringing" free of abuse where all of his

---

[4] Where information in this section was drawn from sources other than the PSR, its source is noted.

basic needs were met.   He has three siblings: two older brothers, who live in New York and South Carolina, and a younger sister who lives in Rhode Island.   The defendant has no children of his own; he was married in 2015 and at the time of his arrest.   His wife has filed for separation but remains supportive of the defendant.

The defendant graduated from high school in New York in 2001 and enlisted in the United States Navy.   He retired with an honorable discharge in 2021 as a Chief Petty Officer (E-7) fire controlman.   In the military, he scored on the 90th percentile of the entry exam, qualified for nuclear engineering, and ultimately supervised 30 to 40 people.   Marcopulos Report at 3.   While in the Navy, he completed a number of college courses and reports having obtained a bachelor's degree in organizational management in 2014.   Since retirement until his arrest, he worked for a joint military command, the Missile Defense Agency, as a program analyst.   He held a Top Secret security clearance and supervised 50 to 60 full-time workers.   Marcopulos Report at 4.

At the time of his arrest, the defendant owned a property that he reported as being worth $2 million.   Pretrial Report.   In the PSR, its valuation is listed as approximately $600,000. According to Zillow, the home is 9 bedrooms, 11 bathrooms, and worth $2.3 million. https://www.zillow.com/homedetails/4641-Water-View-Rd-Water-View-VA-23180/107965079_zpid/

Regarding physical health, the defendant reports bad knees and bad back, and received a 100% Veterans Affairs disability rating which was subsequently lowered to 10%.   As to his mental health, the reports submitted by the defendant reflect a variety of post-arrest diagnoses including pedophilia, autism spectrum disorder (ASD), and bipolar disorder, although he is also assessed as highly intelligent and with normal executive functioning.   Marcopulos Report at 8.   While he now speculates having a brain injury as a child after hitting his mouth on the pool, he has not been

diagnosed with Traumatic Brain Injury (TBI), Gavisk Report at 6–7,[5] despite the likely exhaustive analysis that led to his 100% disability rating.  He reports no history of substance abuse.

To his credit, the defendant has no criminal history, and his criminal history category is accordingly I.

C.  The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A))

The defendant's offense is indisputably serious because he participated in the exploitation of children for his own sexual gratification.  "[D]istrict courts, in the course of selecting an appropriate sentence, ought to give respectful attention to Congress' view that child pornography crimes  are serious offenses deserving serious sanctions."  *United States v. Morace*, 594 F.3d 340, 347 (4th Cir. 2010) (cleaned up).  The defendant, of course, went far, far beyond the consumption of online images of sexual abuse, but the Victim Impact Statements from the known series victims whom the defendant enjoyed watching in the darkest moments of their lives are a heartbreaking testament to the devastating impact of child sexual abuse and the constant circulation of the depictions of that abuse.  For example, "Pia," the victim depicted in the Sweet White Sugar series who was abused at 6 years old like MV1, writes that she "is damaged beyond repair" and that "[t]he unending pain and trauma completely engulf every part of my body." "Alex," the victim depicted in the RCA series, recounts how knowing that depictions of her abuse are available for public consumption causes her to be regularly nauseous in public, collapse in fear, and be "like an innocent person locked in prison forever."

---

[5] The defendant's M.R.I. study notes his brain "is within normal limits" other than "two extremely subtle foci of signal abnormality."

D.  <u>The Need to Afford Adequate Deterrence & to Protect the Public from Further Crimes (18 U.S.C. § 3553(a)(2)(B), (C))</u>

Given that he deliberately engaged in extreme child sexual abuse activity repeatedly for years, the defendant is in need of a substantial sentence to specifically deter him from future conduct.  The defendant's conduct is also extraordinarily dangerous and warrants a substantial sentence because, particularly with respect to MV1, MV2, and MV3, he participated in the violation the most basic tenets of human relationships.  The government has doubt that he can be specifically deterred, and requests a life sentence in part because it appears the only way to prevent him from abusing children is incarceration.  The "contract" with Paradis is particularly concerning, as it describes the sexual grooming of their future children to facilitate those children's sexual abuse.

To the extent the defendant contends his service in the military is mitigating, the opposite is true: the defendant took an oath to support and defend the Constitution, and violated that oath in the most egregious ways.  Moreover, the fact that he was highly successful in demanding jobs requiring the supervision of dozens of people highlights his dangerousness: the defendant is well able to follow rules and function in society, but simply made different decisions, driven by his overriding sexual interest in younger children.

E.  <u>The Need to Provide Needed Correctional Treatment in the Most Effective Manner (18 U.S.C. § 3553(a)(2)(D))</u>

While incarcerated, the defendant would benefit from sex offender treatment, mental health treatment, and vocational educational opportunities.

F.  <u>The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3))</u>

The available statutory sentence for Count One, 18 U.S.C. § 2251(a), is a mandatory minimum of fifteen years and up to thirty years of imprisonment.  18 U.S.C. § 2251(e).  The

available statutory sentence for Count Ten, 18 U.S.C. § 2422(b), is a mandatory minimum of ten years and up to life imprisonment. A term of supervised release is required for a minimum of five years, and may be imposed for life. 18 U.S.C. § 3583(k).

Regarding special assessments, the $5,000 under the Justice for Victims of Trafficking Act of 2015 ("JVTA") for non-indigent defendants, 18 U.S.C. § 3014, is potentially applicable should the Court sustain the government's objection regarding the same. The defendant may also be ordered to pay up to $50,000 mandated for defendants convicted of offenses involving the production of child pornography under 18 U.S.C. § 2259A(a)(3), the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 ("AVAA"). PSR at 38. The AVAA special assessment should be determined by reference to the factors in 18 U.S.C. §§ 3553(a) and 3572, *id.*, and provides assistance to victims of child sexual abuse offenses. *See* United States Department of Justice, *Defined Monetary Assistance Victims Reserve*, https://www.justice.gov/dmavr.

G. The Sentencing Guidelines and Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(4)-(6))

The defendant is the first defendant to be sentenced in this case. His sole co-defendant and co-conspirator, Grace Paradis, is scheduled for sentencing in May and faces a statutory maximum penalty of 30 years. Although her guidelines range has not yet been finalized, her current PSR calculates her offense level as 48 and her criminal history category as I, resulting in an advisory guidelines range of 360 months (restricted). A significantly higher sentence is appropriate for Hambley, who has a higher offense level: he was the instigator of the conduct with Paradis, as his leadership enhancement reflects, and he was involved in a far broader scope of conduct: he produced child sexual abuse material with respect to an additional victim (MV3), illegally recorded two adult victims (AV1 & AV2), and collected thousands of other depictions of children being

14

abused.  *Cf. United States v. Lattimore*, 454 F. App'x 165, 167 (4th Cir. 2011) (noting that "this court, along with the majority of the circuits, has recognized that § 3553(a)(6) is aimed at eliminating national sentencing disparities, not disparities between codefendants").

The government's recommended sentence is also within the advisory guidelines range, which would serve to avoid unwarranted disparities with any similarly-situated defendants.  *See Gall v. United States*, 552 U.S. 38, 54 (2007) (explaining that "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges"); *United States v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015) ("The purpose of the sentencing guidelines is to eliminate disparities among sentences nationwide." (internal quotation and citation omitted)); *United States v. Parks*, Criminal Action No. 5:05-CR-00257-KDB-DCK, 2020 WL 6826214, at *3 (W.D.N.C. Nov. 20, 2020) ("One of the goals of the Sentencing Guidelines is to avoid national sentencing disparities amongst similar offenders with similar criminal conduct.  *See, e.g.*, *United States v. Johnson*, 445 F.3d 339, 343 (4th Cir. 2006).  Thus, the best way to avoid unwarranted sentencing disparities is for the district court to impose a sentence within the guidelines range.").[6]

A within-guidelines sentence of life imprisonment is particularly appropriate here, where the total offense level exceeds the maximum offense level recognized in the guidelines.

H.  <u>The Need to Provide Restitution (18 U.S.C. § 3553(a)(7))</u>

In his plea agreement, the defendant agreed that restitution was mandatory, and to the entry of a restitution order for the full amount of the victims' losses.  ECF No. 53 ¶ 11.  The defendant

---

[6] To the extent the defendant relies on sentences in other individual cases or statistical evidence, "[t]he requirement of procedural reasonableness does not obligate a trial court to engage in case-by-case comparisons of sentences imposed in cases unconnected to the case before the court."  *United States v. Sueiro*, 59 F.4th 132, 142 (4th Cir. 2023).  *Cf. United States v. Abed*, 3 F.4th 104, 177 (4th Cir. 2021) (cautioning against reliance on statistics, and explaining that such information "hardly presents an apples-to-apples-comparison").

further agreed that pursuant to 18 U.S.C. § 3663(a)(3), victims of the conduct described in the charging instrument, Statement of Facts, or any related or similar conduct are victims within the meaning of 18 U.S.C. § 2259(c) and § 2429(d), and are entitled to restitution. *Id.* Finally, he agreed that

As of the time of this filing, the government has received restitution requests on behalf of MV1 and MV2, and also from 11 of the 139 identified victims NCMEC identified in the defendant's files. The parties have reached an agreed amount regarding MV1 and MV2, and are attempting to resolve the requests from the other victims as of the date of this filing.

Regardless, the government will request a bifurcated restitution determination pursuant to 18 U.S.C. § 3664(d)(5). In his plea agreement, the defendant acknowledged "that determination of the identities, addresses, and loss amounts for all victims in this matter is a complicated and time-consuming process," agreed that the Court may bifurcate restitution, and waived the 90-day limitation in 18 U.S.C. § 3664(d)(5). ECF No. 53 ¶ 11. Even if the parties are in agreement regarding all outstanding restitution requests at the time of sentencing, additional time is needed to fully effectuate all victims' rights regarding restitution. The Victim Identification Report, which is needed to submit victim notifications, was not completed until March 2, 2026. *See* 18 U.S.C. § 3664(d)(5) (noting the court "shall" bifurcate "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing").

VI.    **The Defendant's Evaluations & Summary of Anticipated Testimony**

A.    The Evaluations' Common Flaws Undermined Their Reliability and Weight

The defendant has submitted five evaluations by mental health professionals, none of whom the defense intends to call as witnesses at sentencing. While the government does not doubt the qualifications of most of the report authors, in determining what weight to give these reports the Court should carefully consider the sources of information that form the basis of the reports and weigh them accordingly. Because all but one of the report authors failed to review the offense conduct, such as the 5,000 pages of Signal messages or even the Statement of Facts, the reports cannot possibly reliably assess the defendant's dangerousness or likelihood of reoffending. *See, e.g., United States v. Hudak,* 156 F.4th 405, 409–10 (4th Cir. 2025) ("Here there was a striking incongruence between Graney's expert disclosure, which surmised that mental illness was a cause of Hudak's offense conduct, and her report, *which included almost no facts about the period of time in which the conduct occurred.* It was reasonable for the court to conclude that this analytical gap made Graney's opinion unreliable." (emphasis added)); *United States v. Wilkinson,* 590 F.3d 259, 269 (4th Cir. 2010) ("[A] sentencing court may give weight to any relevant information before it, including uncorroborated hearsay, provided that the information *has sufficient indicia of reliability* to support its accuracy." (emphasis added)).

The lack of review of offense conduct materials is particularly notable for the sole Psychosexual Evaluation, which was prepared in January 2025[7] when "no police report (or other official records)" was available. Ganderson Report at 1. In ordering the defendant's detention following Dr. Ganderson's testimony, the U.S. Magistrate Judge noted this significant deficiency.

---

[7] While other evaluations note that Dr. Ganderson prepared a supplement in May 2025, *see* Marcopulos Report at 2 & Sellman Report at 2, this report has not been provided to the government and is not described in the PSR.

ECF No. 40 at 4 ("Many of Dr. Ganderson's statements seem to indicate an assumption that defendant engaged in merely a non-contact possession of CSAM offense."). Similarly, another report states that the defendant's "assessment data does not indicate any contact offense behavior." Sellman Report at 9. A report from the Dominion Therapy Center, which is referend in the PSR at paragraph 139 but was not submitted to the Court, characterizes the defendant's offense conduct as "viewing" child pornography.

Similarly, several of the reports fail to reconcile the defendant's long history of highly successful performance in the complex field of missile defense and ability to supervise dozens of personnel with their conclusion that he demonstrates substantial difficulties in cognition and functioning.

A third and final common flaw with the reports is their failure to render a specific opinion linking any mental health issues as the cause of the defendant's criminal conduct, only making vague statements regarding the general impacts of the defendant's mental health on his behavior. Last year, in *United States v. Fitzpatrick*, a case involving a defendant diagnosed with Autism Spectrum Disorder (ASD) and convicted of possession of child pornography, among other crimes, the Fourth Circuit emphasized that it was an abuse of discretion to grant a downward variance where "no expert testified that [defendant's] medical condition *caused* his criminal conduct." 126 F.4th 348, 355 (4th Cir. 2025).[8] In that case, and in a prior case, *United States v. Zuk*, 874 F.3d 398 (4th Cir. 2017), defendant had instead presented written reports by psychologists who opined that the ASD diagnoses contributed to their offenses, which the Fourth Circuit held to be an insufficient basis for the downward variances. As in *Zuk* and *Fitzpatrick*, here there is no testimony

---

[8] The Fourth Circuit also held the district court abused its discretion in making the "sweeping conclusion that the Federal Bureau of Prisons could not manage [defendant] given his mental condition," *i.e.*, ASD. 126 F.4th at 354.

or other opinion that the offenses *caused* him to engage in child sexual abuse.

     B. <u>Gavisk Report</u>

     The government has subpoenaed the author of one of these five reports, Dr. Gavisk, which particularly lacks facial reliability on multiple fronts.[9]  His testimony is necessary to explore the glaring issues with his report.  First, Dr. Gavisk's qualifications do not appear to qualify him to render his astonishing ultimate opinion that the defendant "is extremely unlikely to reoffend." Gavisk Report at 34.  Dr. Gavisk, who did not perform a psychosexual evaluation and would not be qualified to perform the same, holds a degree in Educational Psychology, a field that studies "how people learn and retain knowledge."  American Psychological Association, *Educational Psychology    Promotes    Teaching    and    Learning*,    https://www.apa.org/education-career/guide/subfields/teaching-learning (last visited March 4, 2026).

     Second, Dr. Gavisk notes he reviewed "available records and discovery," but does not further specify which records he reviewed regarding the defendant's lengthy history of sexual abuse, information that would be highly relevant in assessing his danger to the community.  Third, and perhaps as a result of a lack of review of case materials, he appears to rely principally on the defendant's wife and defendant's own statements.  One test he administered relies exclusively on reports of the defendant's wife, Gavisk Report at 10, who reported to another evaluator that the defendant "had a very strong sense of what he thought was right or wrong," Marcopulos Report at 4.  Yet neither report accounted for the defendant pressuring his wife to take pictures of MV3 or sending MV3 a video of his wife performing oral sex on him—important information in assessing his wife's credibility that would have been clear with a review of the case materials.

     Elsewhere, Dr. Gavisk makes extraordinary, unquestioning minimizations of the

---

[9] Should the Court decline to accept this report as evidence, Dr. Gavisk's testimony would be unnecessary.

defendant's conduct:

- "Cory saw an opportunity to help an ex-girlfriend who was having monetary problems, and he dove into a bad solution."  Gavisk Report at 31.

- "He provided money to his ex-girlfriend to satisfy his own need to feel like a caretaker and to have a purpose, rather than taking risks simply because he empathized with her situation and wanted to work for her benefit."  Gavisk Report at 32.

Fourth, Dr. Gavisk's explanation of his conclusion that the defendant does not pose a recidivism risk is based facially implausible: that the defendant has demonstrated "adherence to rules that he knows and understands."  Gavisk Report at 34.  Dr. Gavisk fails to explain why the defendant—highly intelligent, capable and skilled—would not have "understood" the rules prohibiting child sexual abuse that he repeatedly violated, such as the wrongfulness of the oral sodomy of a six-year-old child.

For all of the reasons, the government submits that it has shown "good cause" for Dr. Gavisk's testimony.  ECF No. 55 ¶ 8.  The government further requests that Dr. Gavisk be allowed to testify via video, as he has requested due to living in Colorado, which request the defendant does not oppose.  In the alternative, the government requests that the Court decline to consider or rely upon Dr. Gavisk's report altogether.

## VII.    Supervised Release Conditions

To comply with the Fourth Circuit's decision in *United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020), and *United States v. Singletary*, 984 F.3d 341 (4th Cir 2021), the government requests that the Court orally pronounce all conditions of supervised release other than those specifically designated as mandatory under 18 U.S.C. § 3583(d).  In addition to an oral pronouncement of the

individual conditions, compliance with *Rogers* may be achieved by oral reference on the record to another document, such as the PSR.  *Rogers*, 961 F.3d at 299.  Here, the U.S. Probation Office has outlined the mandatory and standard supervised release conditions, as well as recommended special conditions, on pages 39 through 44 of the PSR.  The government requests that the Court impose all of those conditions.

## VIII.    Conclusion

For the reasons stated above, the government submits that a sentence of life imprisonment, which is within the advisory guidelines range, would be sufficient but no greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).


Respectfully submitted,


TODD W. BLANCHE
DEPUTY ATTORNEY GENERAL


By: _____/s/_____
    E. Rebecca Gantt
    Assistant United States Attorney
    VSB No. 83180
    101 West Main Street, Suite 8000
    Norfolk, Virginia 23510
    Tel. - 757-441-6350
    Fax - 757-441-6689
    E-mail Address – rebecca.gantt@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 4, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record who are users of the CM/ECF system.

I further certify that on March 4, 2026, I will send an electronic copy of the foregoing to the following:

Kalyn M. Monreal
United States Probation Officer

_____/s/_____
E. Rebecca Gantt
Assistant United States Attorney
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Tel. - 757-441-6350
Fax - 757-441-6689
E-mail Address – rebecca.gantt@usdoj.gov
